UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SCOTT F.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-02065-JMS-DLP |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Scott F. applied for disability insurance benefits from the Social Security Administration ("SSA") on November 6, 2016, alleging an onset date of April 8, 2015. [Filing No. 9-2 at 19.] His application was initially denied on January 17, 2017, [Filing No. 9-4 at 2], and upon reconsideration on June 9, 2017, [Filing No. 9-4 at 9]. Administrative Law Judge Monica LaPolt ("the ALJ") conducted a hearing on December 3, 2018. [Filing No. 9-2 at 36-68.] The ALJ issued a decision on January 28, 2019, concluding that Scott F. was not entitled to receive benefits. [Filing No. 9-2 at 16-29.] The Appeals Council denied review on October 28, 2019. [Filing No. 9-2 at 2.] Following a complaint seeking judicial review, a district judge granted the

---

[1] To protect the privacy interests of claimants for Social Security benefits, and consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

1

parties' joint motion to remand the case on March 3, 2020. [Filing No. 9-10 at 30.] On February 24, 2021, the ALJ conducted another hearing, [Filing No. 9-9 at 25-42], and on March 23, 2021, she issued another decision that concluded that Scott F. was not disabled, [Filing No. 9-9 at 2-16]. Scott F. did not file written exceptions to the ALJ's decision, and the Appeals Council did not review the ALJ's decision, making it the final administrative decision effective May 23, 2021. [*See* Filing No. 9-9 at 2-3.] On July 20, 2021, Scott F. timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g). [Filing No. 1.]

# I.
## STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. "[S]ubstantial evidence" is "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or

reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)). The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform [his] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted). "If a claimant satisfies steps one, two, and three, [he] will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then [he] must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses

the RFC at Step Four to determine whether the claimant can perform his own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

## II.
### BACKGROUND

Scott F. was 40 years old when his alleged disability began. [*See* Filing No. 9-5 at 2.] He has taken some college courses, but the highest degree he earned was a GED. [Filing No. 9-9 at 30.] He previously worked as a salesperson and auto service attendant. [Filing No. 9-6 at 7.][2]

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and concluded that Scott F. was not disabled. [Filing No. 9-9 at 16.] Specifically, the ALJ found as follows:

- Scott F. last met the insured status requirements of the Social Security Act on December 31, 2016, his date last insured.[3] [Filing No. 9-9 at 8.]

---

[2] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[3] Scott F. must prove the onset of disability on or before his date last insured to be eligible for disability insurance benefits. *See Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012); *see also*

- At Step One, he had not engaged in substantial gainful activity.[4] [Filing No. 9-9 at 8.]

- At Step Two, Scott F. "had the following severe impairments: depression; anxiety with agoraphobia; unspecified bipolar-related disorder; and Type II diabetes mellitus with neuropathy." [Filing No. 9-9 at 8.]

- At Step Three, he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [Filing No. 9-9 at 8.]

- After Step Three but before Step Four, Scott F. had the RFC "to perform light work as defined in 20 CFR 404.1567(b) with the following limitations. The claimant could lift/carry 10 pounds frequently and 20 pounds occasionally. He could stand/walk about six hours and sit about six hours during an eight-hour workday. The claimant could occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. He could occasionally balance, stoop, kneel, crouch, and crawl. He could understand, remember, and follow simple instructions. Within these parameters and in the context of performing routine tasks, the claimant could sustain attention and concentration skills for two-hour blocks of time. Despite some interruptions from psychologically-based symptoms, he had the ability to complete a normal workday and workweek without being off-task more than 5% of the time. He could not perform tandem tasks and could not have any transactional interaction with the public." [Filing No. 9-9 at 10.]

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Scott F.'s RFC, he was incapable of performing any of his past relevant work as an automobile supplies sales representative, tire service supervisor, and service manager. [Filing No. 9-9 at 14.]

---

20 C.F.R. § 404.131. The ALJ's subsequent findings were limited to the period at issue, beginning with the alleged onset date, April 8, 2015, through the date last insured. [*See, e.g.*, Filing No. 9-9 at 8.]

[4] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

- At Step Five, relying on the VE's testimony and considering Scott F.'s age, education, work experience, and RFC, he could have adjusted to other work with jobs existing in significant numbers in the national economy in representative occupations like a housekeeper, laundry worker, and stock checker. [Filing No. 9-9 at 15.]

## III.
### DISCUSSION

Scott F. asserts a single error, arguing that the ALJ failed to adequately consider the psychological experts' opinions that she purported to find persuasive. Scott F. contends that the ALJ found the opinions of the state agency psychologists to be persuasive, but she did not account in her RFC finding for all their suggested limitations with concentration and social interaction or explain her deviations from their opinions. [Filing No. 12 at 12-16.] He contends that the ALJ failed to address her deviations directly, but elsewhere, she played doctor by explaining—based on her own review of the same evidence prior to Scott F.'s date last insured that was reviewed by the consultants—that he had improved when he was compliant with his medications. [Filing No. 12 at 16-17.] He further contends that the ALJ's "lacking explanation is particularly problematic" considering her prior decision was remanded because she had failed to adequately consider the same opinions. [Filing No. 12 at 15-17.] Scott F. asserts that he exhibited uncontrolled anger and unusual behavior even while on medication. [Filing No. 12 at 18.] He further asserts that the record shows that he had a pattern of stopping treatment and medications because his mental impairments persisted, not the "false narrative provided by the ALJ" that his behavioral abnormalities returned only after he stopped his medications. [Filing No. 12 at 18.] Scott F. also contends that the "fairly benign" social interaction limitations that were assessed by the ALJ cannot

be reconciled with the record showing that he got into altercations with a security guard, the police removed his firearms from his house because he was threatening suicide, he cursed angrily at treatment providers, and he had shoved a supervisor when he was working. [Filing No. 12 at 21.]

The Commissioner contends that the ALJ did not reject any portion of the psychological experts' opinions, and the ALJ's RFC finding was consistent with the experts' opinions that Scott F. could work in environments with fewer people, perform unskilled tasks without special considerations, and attend to tasks for sufficient periods of time. [Filing No. 13 at 8.] She also contends that the ALJ did not make any improper medical determinations because her assessment of Scott F.'s work abilities was consistent with the experts' narrative opinions. [Filing No. 13 at 10.]

In his reply, Scott F. largely reiterates the same arguments he advanced in his initial brief, but he also contends that one aspect of the Commissioner's response is "immediately muddled and inconsistent."[5] [Filing No. 14 at 1.]

---

[5] Scott F. also argues that the ALJ's "paragraph B" findings that Scott F. had no more than a mild limitation with concentration, persistence, or maintaining pace, and no more than moderate limitation interacting with others were inconsistent with the psychological experts' findings that Scott F. had moderate limitations with concentration, persistence, or maintaining pace and marked limitation interacting with others. [Filing No. 12 at 18-20.] The limitations identified in the paragraph B criteria are used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process. 20 C.F.R. § 404.1520a(d)-(e). However, the RFC assessment used at Steps Four and Five requires a more detailed assessment by itemizing various functions contained in the broad areas of functioning found in paragraph B of the adult mental disorder listings. Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996), 1996 WL 374184, at *4. The Commissioner argues that Scott F. cannot point to any legal authority that the ALJ was required to adopt the experts' paragraph B ratings. [Filing No. 13 at 8.] In his reply, Scott F. argues that the ALJ was not required to adopt the experts' assessments, but she is required to explain her departure from their assessments, and here, she "superficially claimed to adopt their

Following the district court's order to remand the case back to the SSA for further proceedings, the Appeals Council issued the following order to the ALJ:

> The hearing decision did not adequately consider the claimant's social interaction and stress limitations. The claimant testified about issues getting along with people, including getting into a shoving match with his boss and being assigned to work in the back to get him away from people. The State agency medical consultants concluded the claimant had marked limitations in interacting with others and needed an environment with "fewer persons in them, and where stress levels are limited." The decision provided no discussion of any stress limitation and only limited the claimant from work requiring transactional interaction with the public. The decision gave only some weight to the State agency opinions, but the only rationale provided was that these physicians did not consider evidence submitted after their reports or personally examine the claimant. The decision identifies no specific later submitted evidence that contradicts the State agency opinions that the claimant had marked social interaction limitations and that social interaction and stress should be limited. The decision also did not discuss the claimant's testimony about his difficult social interactions on the job.
>
> The decision provided no specific support for the conclusion that the claimant had no greater social interaction limitation, except that "the medical evidence does document symptoms of social anxiety and avoidant behavior. However, while the claimant is divorced, he has currently been married for over 15 years. Additionally, the claimant is capable of driving[;] there is no document evidence that the claimant isolates himself." To the contrary, as noted by the State agency, the claimant "can drive but rarely does so" and the claimant is ["]socially isolating [him]self." The decision provides no rationale to correlate the claimant's 15 year marriage and ability to drive with the ability to handle social interactions. Further consideration of the State agency medical opinions and the claimant's mental impairments is required.

[Filing No. 9-10 at 35-36 (citations omitted and cleaned up).]

---

limitations by giving them "great weight.'" [Filing No. 14 at 2-3.] Because Scott F. focuses his argument on the deficiencies in the RFC, the Court will do likewise as opposed to conducting a paragraph B analysis.

"The very essence of judicial review is to determine whether an agency complies with its own regulations and procedures so that there may be uniformity in decisions." *Moore v. Colvin,* 2013 WL 4584618, at *5 (S.D. Ind. Aug. 28, 2013) (citing *Sierra Club v. Martin,* 168 F.3d 1, 4 (11th Cir. 1999) ("courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself")). "When a Federal court remands a case to the Commissioner for further consideration, the Appeals Council, acting on behalf of the Commissioner, may make a decision, or it may remand the case to an administrative law judge with instructions to take action and issue a decision . . . ." 20 C.F.R. § 404.983. "If the case is remanded by the Appeals Council, the procedures explained in §404.977 will be followed." *Id.* "The administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b).

### A. Exposure to Stress

Upon remand, the ALJ again did not discuss how the RFC finding limited Scott F.'s exposure to stress. Once again, the ALJ also failed to discuss Scott F.'s testimony that he had gotten into a physical altercation with his supervisor, and that he needed to be moved to a work environment that was away from people. The VE testified that an employee may be given one warning if he shouts at someone at work but there was no tolerance in the competitive economy for an employee who got into a physical altercation, and he would be fired after the first instance. [Filing No. 9-9 at 39-40.] Consistent with the VE's testimony, the SSA's guidance explains:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15 (S.S.A. Jan. 1, 1985), 1985 WL 56857, at *4. The ALJ should have addressed how her RFC finding accounted for Scott F.'s ability to deal with stress and respond appropriately to supervision.

**B. Social Interaction**

The Seventh Circuit has explained that "[w]hen an agency decision is so ambiguous that it frustrates judicial review, it cannot be upheld." *Poole v. Kijakazi*, 28 F.4th 792, 796 (7th Cir. 2022) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted b[e] clearly disclosed and adequately sustained."). The ALJ followed the Appeals Council's order to give further consideration to the state agency psychological consultants' opinions. The ALJ explained:

> State agency psychological consultant Ken Lovko, Ph.D. reviewed the records in evidence as of January 2017. There, Dr. Lovko opined that the claimant retained the capacity to deal with work environments that have fewer persons in them and where stress levels are limited. Dr. Lovko further opined that the claimant could understand, remember, and carry out unskilled tasks in many work environments, as well as that he could attend to tasks for sufficient periods of time in order to complete the tasks. Upon Reconsideration, state agency psychological consultant Kenneth Neville, Ph.D. reviewed the records in evidence as of June 2017 and concurred with Dr. Lovko. I give great weight to these opinions. Drs. Lovko and Neville provided sufficient support for these opinions, including citation to the record and discussion of the claimant's symptoms and treatment. Drs. Lovko and

> Neville also noted the claimant's issues with medication compliance. These opinions are also consistent with the overall record.

[Filing No. 9-9 at 13-14 (citations omitted).] Despite giving the consultants' opinions great weight, the ALJ's RFC finding did not limit the amount of people in Scott F.'s work environment. Instead, she limited the quality of interaction that Scott F. would have with others. The RFC precludes any tandem tasks with coworkers and transactional work with the public. One of the occupations, for example, that the ALJ concluded that Scott F. could perform, as a "stock checker," is actually titled an "apparel" stock checker in the *Dictionary of Occupational Titles*, and is described as:

> Gathers and counts garments tried on by customers in fitting rooms of retail store: Hangs garments according to size on display racks, and refastens belts, buttons, and zippers on garments tried by customers. Counts number of garments carried in and out of dressing rooms to assure no garments are missing. May sew on missing and loose buttons, hooks, and loops.

*DICOT*, 299.667-014 (G.P.O. 1991), 1991 WL 672642. The occupation does not include transactional work with the public, but the work environment is in a retail store in close proximity to customers. The ALJ found that one of Scott F.'s severe impairments was agoraphobia, and the Appeals Council explicitly disagreed with the ALJ's prior assessment that the record did not show that Scott F. isolated himself from others. The SSA's guidance explains that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p (S.S.A. July 2, 1996), 1996 WL 374184, at *7. Immediately after explaining that the psychological consultants had considered Scott F.'s noncompliance with medication, the ALJ also explained that his "symptoms and functioning—including his social functioning—have noticeably improved during periods of medication compliance." [Filing No. 9-

9 at 14.] The ALJ's explanation supplies a rationale to depart from the consultants' opinions, but there are at least three problems with her explanation.

First, the ALJ's decision is ambiguous. She gave great weight to the consultants' opinions, but her findings are not consistent with their assessments. Second, the Appeals Council explained that the ALJ had not identified any evidence that was submitted after the psychological consultants' assessments that contradicted their opinions that Scott F. had marked limitations with social interaction. The ALJ again did not identify evidence that was submitted after the consultants' reviews that contradicted their opinions. Instead, she relied on the same evidence that the consultants' considered and reached her own conclusions, and she did so despite acknowledging that the expert consultants explicitly considered the basis of her rationale—Scott F.'s medication noncompliance—for departing from their assessments. Not only is the ALJ's rationale logically ambiguous, but she did not correct the issue with her prior decision that was identified by the Appeals Council.

In addition, there is a related problem with the ALJ's rationale that is even more problematic. The Seventh Circuit has explained that "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill,* 896 F.3d 768, 774 (7th Cir. 2018) (citations omitted). Here, the ALJ explained:

> Therefore, multiple factors mitigate the significance and weight that I assign to evidence of the claimant's inappropriate behavior and periods of more significant mental impairment symptoms. The factors of significant marital problems/instability along with medication issues of adjustment and noncompliance certainly undermine the weight and significance of the claimant's sporadic instances of inappropriate behavior. Further, the claimant's behavior seemed to become the most inappropriate when treatment providers offered

>inpatient treatment. (See Ex. 2F-117 (pattern of asking for treat[ment] but becoming angry and threatening when inpatient treatment is arranged)). Moreover, as cited above, the record documents multiple instances in which the claimant's behavior was appropriate. In fact, the claimant also seemed consistently to present with normal behavior outside of mental health treatment, such as during primary care office visits. (Ex. 3F-9, -109, -141, (cooperative), -176). Additionally, the record refers to the claimant having a friend, supporting that he retained sufficient social capacity to maintain a friendship. (Ex. 2F-74, -95).

[Filing No. 9-9 at 13.] The multiple factors identified by the ALJ omit critical details about the record and exemplify why she should rely on experts.

"For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) (citing *Pate–Fires v. Astrue,* 564 F.3d 935, 945 (8th Cir. 2009) (listing cases recognizing that a mentally impaired person's noncompliance with treatment "can be . . . the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse.") (citations, internal quotation marks, and brackets omitted). The Seventh Circuit has joined the circuits above in holding that an ALJ's minimum duty to consider possible explanations for noncompliance issues—before drawing a negative credibility inference—is heightened with claimants that have significant mental impairments. See *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (collecting cases); *see also Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (collecting authorities concluding that noncompliance is often a component of bipolar disorder, for example).

A brief sampling of Scott F.'s mental health treatment course during the period at issue is illustrative. On April 17, 2015, he reported a long history of anxiety and possible schizoid/paranoid traits; he did not like people in general and avoided them a lot; he was irritable,

13

easily triggered, pessimistic, and could not sleep because of ruminating and racing thoughts; he was not leaving the house at all; his wife had to do most of the talking for him; she felt like she was walking on eggshells around him; he was not trusting; and he did not want therapy. [Filing No. 9-7 at 25.] On May 15, 2015, Scott F. reported that he was having good days and bad days, he was more irritable, and there were days that he felt normal, but he was easily triggered to respond angrily to trivial things like his kids talking in the back seat of the car. [Filing No. 9-7 at 35-37.] He was reluctant to be on certain medications or "to carry a [diagnosis] of bipolar" disorder because his ex-wife had used that against him to keep him from visiting his children. [Filing No. 9-7 at 35.] His treating provider recorded his mood to be dysphoric, irritable, labile, and anxious. [Filing No. 9-7 at 37.] On June 5, 2015, both Scott F. and his wife reported a positive response to his current combination of medications, he had finished some college classes, he did well on them, he was close to completing the program, his wife reported that he had been less reactive overall, and other family members had commented that he seemed more engaged. [Filing No. 9-7 at 42.] His mental status examination recorded him to be cooperative, calmer, and less reactive, but he was still irritable. [Filing No. 9-7 at 44.] His provider noted that he would probably benefit from more long-term therapy, but he could not afford it. [Filing No. 9-7 at 45.] On July 10, 2015, both Scott F. and his wife reported that he was stable with no major outbursts, other family members had continued to notice his improved mood, he reported compliance, he felt more positive overall about the changes that he had made, and he seemed "to be working with providers better, which had been hard for him." [Filing No. 9-7 at 49.] He showed good judgment, insight, and impulse control during his examination. [Filing No. 9-7 at 52.]

On August 25, 2015, Scott F. was evaluated for anxiety and uncontrolled anger, and he was described as "acutely ill." [Filing No. 9-7 at 58.] He reported a breakdown about three weeks earlier when he needed to have his lower teeth removed, and he also had a dispute with his wife about his daughter from a previous marriage. [Filing No. 9-7 at 58.] He had taken his daughter to a crisis center, "got into it with security," and when he got home, he loaded a gun and threatened to kill himself, the police were called, and the guns were removed from his house. [Filing No. 9-7 at 58.] On September 3, 2015, Scott F. reported that he had been doing well on his medications, but he presented with a sullen and irritable mood, he reported that he was not getting along with his wife, he was set on stopping all his medications, "not just the psych meds," because it was time, and he was willing to accept the risk of his symptoms worsening. [Filing No. 9-7 at 67-68.] He said he was willing to go off the medications in phases, but his provider suspected that he had already stopped one or more of them. [Filing No. 9-7 at 67.] His mental status examination recorded that he appeared disheveled with poor hygiene, his mood was dysphoric, irritable, and calm, and he displayed poor judgment, poor impulse control, and severely limited insight. [Filing No. 9-7 at 69.] Scott F.'s provider observed that he was "not manic or psychotic," but he had "an angry edge to him and [was] easily defensive." [Filing No. 9-7 at 72.] His provider explained that he was "repeating the pattern of self sabotage," as he had done before, he was not open to discussion, he reported that he did not care, and he was not interested in therapy without medication either. [Filing No. 9-7 at 72.] On October 15, 2015, Scott F.'s provider also explained that he was "trying to do things to work on himself, but in the past this has not lasted. [He h]as personality traits that are passive aggressive, narcissistic, borderline, and avoidant. These affect his

interpersonal relationships[,] self[-]care, and view of the world." [Filing No. 9-7 at 84.] Scott F. was willing to try a mood stabilizer, he was more pleasant, and not angry, but his provider warned that if the developing chance of reconciliation with his wife did not occur, his "improvements may not be sustained." [Filing No. 9-7 at 85.] His provider added "[p]ersonality traits and coping style affecting medical condition" to Scott F.'s diagnoses, along with anxiety and mood disorders. [Filing No. 9-7 at 85-86.]

On November 13, 2015, Scott F. reported that he had moved back in with his wife and kids, but he reported to his provider that he had suicidal thoughts with intent and plan to either overdose or shoot himself, he stated that he had access to a gun, and he was cutting himself. [Filing No. 9-7 at 102-03.] His provider observed that he came across as "gamey," "manipulative," and angry, and he had reported to a student at the provider that he was self-medicating with marijuana and Oxycontin. [Filing No. 9-7 at 103.] Scott F.'s provider informed his wife of the developments, and she reported that he had been more irritable, angry, and he had recently made threats to kill "his friend" who she had an affair with the past summer. [Filing No. 9-7 at 103.] Scott F. agreed to consider the inpatient treatment that his provider thought was "needed," but he abruptly changed his mind, became threatening, was ultimately allowed to leave, and said he would not return to the provider. [Filing No. 9-7 at 106.] His provider added mixed personality disorder to his diagnoses. [Filing No. 9-7 at 107.]

The ALJ did not mention Scott F.'s personality disorder. There is no evidence that she appreciated his provider's assessment that his personality traits—that led to his eventual diagnosis—contributed to a pattern of self-sabotage that included abruptly stopping treatment. The

ALJ referenced Scott F.'s inappropriate behavior generally, but she did not address salient facts that the police had to remove guns from his home and he reported suicidal and homicidal plans. A later treating psychiatrist observed that Scott F. had a good range of affects that was not congruent with his reported level of distress, and the provider explained that was a "tipoff of personality disorder features." [Filing No. 9-15 at 26.] This expert insight undermines the ALJ's explanation that treating providers who were not mental health specialists had not observed Scott F.'s mood to be abnormal. In proper context, Scott F. reportedly having a "friend" was hardly evidence of his ability to maintain stable and appropriate personal relationships. Furthermore, that Scott F. became threatening with his treating providers only in the context of being told he needed inpatient treatment is hardly evidence that his mental impairments were not severe. According to the VE's relevant testimony, even "sporadic" inappropriate behavior of the nature described in the record would preclude Scott F.'s ability to sustain work. Further consideration of Scott F.'s ability to interact appropriately with others is necessary.

### C. Appropriate Relief

Scott F. requests remand with either instructions to award benefits or for further proceedings. "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005) (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)). Numerous questions are left unresolved by the ALJ's decision, including whether she considered certain salient facts, how her RFC finding accounts for Scott F.'s limitations with handling stress, and the effect of more appropriate limitations on his capacity to adjust to other work. Further

17

expert guidance may also be necessary. Accordingly, an award of benefits is premature, and remand is needed for further consideration of the psychological consultants' opinions, the Appeals Council's instructions, Scott F.'s RFC, and the entire relevant record.

## IV.
### CONCLUSION

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying Scott F. benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C.§ 405(g) (sentence 4) as detailed above. Final Judgment will issue accordingly.

Date: 6/30/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel